*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-TX-383

JASWANT SAWHNEY IRREVOCABLE TRUST, INC., APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CVT-27-17)

(Hon. Alfred S. Irving, Jr., Trial Judge)

(Argued March 5, 2020                    Decided September 3, 2020)

*Sat Nam S. Khalsa*, with whom *Roland F. Sennholz* was on the brief, for appellant.

*Mary L. Wilson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for appellee.

Before MCLEESE and DEAHL, *Associate Judges*, and RUIZ, *Senior Judge*.

DEAHL, *Associate Judge*:  Appellant Jaswant Sawhney Irrevocable Trust, Inc. applied for a real property tax exemption under D.C. Code § 47-1002(13) (2015 Repl.).  The real property in question is the only Sikh temple—also known

as a gurdwara—in Washington, D.C.  The tax exemption application was denied by the District of Columbia Office of Tax and Revenue (OTR), and Sawhney Trust appealed by filing a petition in the Superior Court.  The Superior Court dismissed Sawhney Trust's petition for failure to state a claim upon which a tax exemption could be granted.  We reverse and remand for further proceedings.

## I.

The following facts are not in dispute.  Sawhney Trust is a nonprofit charitable corporation registered in the District of Columbia.  It purchased the Sikh Gurdwara located at 3801 Massachusetts Avenue, NW, also known as Square 1816, Lot 45, on May 7, 2013.  Before Sawhney Trust purchased it, the Sikh Cultural Society of Washington, D.C., Inc. owned and operated the Gurdwara.  The property was deemed tax exempt by OTR between 2005, when it opened as a gurdwara, and 2013, when the Sikh Cultural Society sold it to Sawhney Trust.  When Sawhney Trust sought to extend that tax exemption, its application was denied.  OTR's denial letter explained that Sawhney Trust could not avail itself of the tax exemption extended to "churches" under D.C. Code § 47-1002(13), because that provision "requires that a building must be owned and used by a single congregation in order to qualify for exemption," whereas "the Trust is a

charitable organization, rather than a religious entity," and therefore "cannot be considered a church or congregation" under § 47-1002(13). Sawhney Trust filed a petition seeking further review in the Superior Court. *See* D.C. Code § 47-1009.

In its petition, Sawhney Trust claimed that the Gurdwara qualified for exemption under D.C. Code § 47-1002(13), which exempts "[c]hurches, including buildings and structures reasonably necessary and usual in the performance of the activities of the church." In addition to owning the Gurdwara, Sawhney Trust alleged that it had also operated the Gurdwara since buying the property from the Sikh Cultural Society. It asserted that it "operate[d] Sikh Gurdwara (Sikh Temple), as its auxiliary for conducting many religious activities." Specifically, Sawhney Trust claimed that under its ownership, the property remained dedicated to the "identical purposes" as under the Sikh Cultural Society's ownership, which included serving "the religious, social, cultural, educational and spiritual needs" of the Sikh community in the District. Sawhney Trust indicated that it had even "added several religious activities" to the work of the Gurdwara. Beyond these factual allegations, Sawhney Trust alleged legal error in OTR's denial of its application. It disputed OTR's premise for denying its application, namely, that a church building "must be owned and used by a single *congregation*" in order to qualify for exemption under § 47-1002(13).

The government moved to dismiss Sawhney Trust's petition for failing to state a cognizable claim for exemption. It argued that concurrence of ownership and use, the test applied by OTR in its determination, was, in fact, a prerequisite for tax exemption under § 47-1002(13). Sawhney Trust's petition, it argued, could not survive this test because the property at issue was "owned by [Sawhney Trust], which is a separate entity from the congregation which uses it."

The trial court granted the government's motion and dismissed Sawhney Trust's petition. In its order, the court focused primarily on the legal question at issue: whether concurrent ownership and use is required for exemption under § 47-1002(13). The court concluded that concurrence of ownership and use is required by *Trustees of St. Paul Methodist Episcopal Church South v. District of Columbia*, 212 F.2d 244 (D.C. Cir. 1954) and *Bethel Pentecostal Tabernacle, Inc. v. District of Columbia*, 106 A.2d 143 (D.C. 1954). With regard to the facts alleged by Sawhney Trust in its petition, the court indicated it was "not persuaded by Sawhney Trust's attempt to classify the Sikh Temple as an auxiliary of Sawhney Trust" and concluded that the property was "not entitled to an exemption under D.C. Code § 47-1002(13) because Sawhney Trust, the Property's owner, is a legal entity separate and apart from the Sikh community that uses the Property."

The trial court did not address OTR's conclusion that, to be entitled to an exemption, Sawhney Trust had to be a religious organization.

## II.

Before turning to the merits, we address this court's sua sponte inquiry into whether Sawhney Trust's January 5, 2016, "Application for Exemption from D.C. Real Property Tax" should be considered as part of the appellate record before us. The application was submitted to OTR and relied upon in its exemption denial, but never filed with the Superior Court. We agree with the government's position, taken at oral argument, that the application was not part of the record before the Superior Court and is not before us. We thus do not consider it in reaching our decision.

We have held that the Superior Court's review of adverse tax assessment rulings is conducted "on the basis of evidence presented at trial," rather than on the administrative record. *Square 345 Assocs. v. District of Columbia*, 721 A.2d 963, 965 (D.C. 1998); *see also District of Columbia v. N.Y. Life Ins. Co.*, 650 A.2d 671, 672 (D.C. 1994) (The Superior Court's "task is not to conduct a review of agency action. Rather, the court must make an independent valuation of the property on the basis of the evidence presented at trial."); *Rock Creek Plaza-Woodner Ltd.*

*P'ship v. District of Columbia*, 466 A.2d 857, 859 n.1 (D.C. 1983) ("When a taxpayer appeals to the Superior Court . . . . 'the whole case, both facts and law, is open for consideration.'") (quoting *District of Columbia v. Burlington Apt. House Co.*, 375 A.2d 1052, 1057 (D.C. 1977) (en banc)).

This is not only a binding interpretation of the applicable statutory provisions but also a sound one. Section 47-3303 of the D.C. Code, which governs Superior Court review of petitions from tax exemption denials,[1] provides that the Superior Court "shall hear and determine all questions arising on appeal and shall make separate findings of fact and conclusions of law." Section 47-3304(a) provides, relatedly, that "[d]ecisions of the Superior Court in civil tax cases are reviewable in the same manner as other decisions of the court in civil cases tried without a jury." These provisions suggest that the Superior Court record begins as a clean slate and is to be developed by the parties; it is neither limited to, nor necessarily supplemented by, the record before the agency.

---

[1] *See* D.C. Code § 47-1009 (adverse decisions under § 47-1002, as here, may be appealed "in the same manner and to the same extent as is provided in §§ 47-3303 and 3304").

It admittedly adds some confusion that our statutory provisions refer to a Superior Court proceeding challenging a tax assessment as an "appeal." *See* D.C. Code § 47-1009 ("appeal to the Superior Court"); D.C. Code § 47-3303 (referring to Superior Court assessment challenge as an "appeal"); *cf.* Super. Ct. Tax R. 6(b)(4) (requiring Superior Court petitioner to plead assignments of error to the assessing authority). But this minor linguistic oddity does not compel a contrary conclusion. *See, e.g.*, *Colten v. Kentucky*, 407 U.S. 104, 115 (1972) (discussing right to "appeal" that is "in reality a trial de novo").

Given the Superior Court's broad authority to receive new evidence, establish a distinct record, and make independent factual determinations, we conclude that Sawhney Trust's petition for review initiated a new proceeding and that the agency filings did not automatically become part of the record before the Superior Court. Simply put, in appeals from tax exemption denials—unlike most appeals preceded by an agency determination—the administrative proceedings do not limit the courts' consideration, nor do the usual principles of judicial deference and substantial evidence review apply. When challenging an adverse tax assessment or exemption denial it is incumbent on the petitioner to present to the Superior Court any evidence—including any materials before the agency—that it is entitled to the exemption. *Square 345 Assocs.*, 721 A.2d at 965 ("[T]he taxpayer

bears the burden to show that the assessment it challenges is incorrect."); *see also* Super. Ct. Tax R. 6(b) (instructing that the "petitioner may append to the petition such other statements or documents as are material"). The application is thus not before us on appeal because it was never entered into the Superior Court record. *See* D.C. App. R. 10(a). Either party may seek to submit the application into the trial court record on remand, though we leave to the trial court whether to accept such a submission.

**III.**

We now turn to the merits. The trial court dismissed Sawhney Trust's petition for failure to state a claim upon which relief (a tax exemption) might be granted. We review dismissals for failure to state a claim, like those under Rule 12(b)(6),[2] de novo. Super. Ct. Civ. R. 12(b)(6); *Grayson v. AT&T Corp.*, 15 A.3d 219, 228 (D.C. 2011) (en banc). In reviewing the petition under this standard, we

---

[2] The parties have never disputed that the standards embodied in Super. Ct. Civ. R. 12(b)(6) applied to the proceedings below, though as the trial court noted, the tax division has not formally adopted Rule 12(b)(6) and does not have an equivalent provision in its own rules. Nonetheless, it is common practice for the tax division to hear and decide motions to dismiss under the framework of Rule 12(b)(6). Given the parties' agreement that Rule 12(b)(6)'s familiar standards were applicable to the proceedings below, we review the judgment as we would a Rule 12(b)(6) dismissal.

accept all factual allegations as true and construe all inferences in favor of the petitioner. *Grayson*, 15 A.3d at 228. "Because '[o]ur rules reject the approach that pleading is a game of skill in which one misstep . . . may be decisive to the outcome' and 'manifest a preference for resolution of disputes on the merits, not on technicalities of pleading,' we construe pleadings 'as to do substantial justice.'" *Id.* (quoting *Clampitt v. Am. Univ.,* 957 A.2d 23, 29 (D.C. 2008)). A case should not be dismissed at the pleading stage because the trial court does not believe a plaintiff will ultimately prevail. "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* (quoting *Solers, Inc. v. Doe*, 977 A.2d 941, 947 (D.C. 2009)). The test we apply is the one outlined by the United States Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)—whether there is sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (quoting *Iqbal*, 556 U.S. at 678).

When addressing disputes over the District's real property tax exemption statutes, we bear in mind that "[i]t is firmly established in the jurisprudence relating to the District's real property tax that exemptions from taxation are to be construed strictly against the party claiming an exemption." *Nat'l Med. Ass'n, Inc. v. District of Columbia*, 611 A.2d 53, 55 (D.C. 1992). "Any arguable ambiguity in

the statutory language must consequently be resolved, if reasonably possible, in favor of the District." *1137 19th St. Assocs. v. District of Columbia*, 769 A.2d 155, 164 (D.C. 2001).

Sawhney Trust raises two main arguments in support of reversing the trial court's judgment of dismissal. First, it makes the broad argument that concurrence of ownership and use is not required under the plain terms of § 47-1002(13), so that the trial court erred in imposing that requirement.[3] Second, it argues that even if concurrent ownership and use is required, the trial court erred in granting the motion to dismiss because the petition, viewed in the light most favorable to Sawhney Trust, sufficiently alleged concurrent ownership and use. We take these arguments in turn, and, because we agree with Sawhney Trust on the second point, we then address the government's additional arguments for affirmance.

**A.**

---

[3] It argues, in the alternative, that to the extent our precedents require concurrence of ownership and use, those precedents were wrongly decided and should be overturned. As Sawhney Trust recognizes, however, a division of this court is not empowered to overturn our past precedents so we do not consider this argument. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court," as "such result can only be accomplished by this court en banc.").

Sawhney Trust's broad argument is that, contrary to the trial court's reasoning, there is no concurrence of ownership and use requirement in § 47-1002(13). That provision's plain language, the argument goes, is indifferent to who owns the church property in question. "[T]he exemption applies to the building not the institution" that owns it, Sawhney Trust argues, and "[s]o long as the church building in question is used . . . primarily and regularly for public religious worship, the building is eligible for exemption." In other words, in Sawhney Trust's view, "church buildings are entitled to exemption based on the activities that take place within them rather than on who owns a particular church building." The plain language of § 47-1002(13) is susceptible to that reading, as it exempts the following real property from taxation:

> Churches, including buildings and structures reasonably necessary and usual in the performance of the activities of the church. A church building is one primarily and regularly used by its congregation for public religious worship.

D.C. Code § 47-1002(13).[4]

---

[4] Throughout this opinion we use the term "church," as it appears in the statute, but understand it to include like buildings that are affiliated with religious and spiritual groups outside the Christian tradition including, for example, gurdwaras, mosques, temples, and synagogues.

Whatever force Sawhney Trust's statutory interpretation argument has, however, its interpretation is squarely foreclosed by our precedents. The United States Court of Appeals for the District of Columbia Circuit narrowly interpreted the statute's text in 1954 when deciding *Trustees of St. Paul*, 212 F.2d at 248–49, 249 n.6, an opinion that is binding on this court.[5] In *Trustees of St. Paul*, the court considered whether a church owned by a Methodist religious corporation, which was rented out to several entirely separate religious organizations,[6] was entitled to a tax exemption under the identically worded predecessor to the modern-day § 47-1002(13). *Id.* at 246 & n.1 (construing D.C. Code § 47-801a(m) (1951 Ed.)). The court found that the church did not qualify for exemption because it "had not been 'primarily and regularly used by *its congregation* for public religious worship.'" *Id.* at 248.

---

[5]  *M.A.P.*, 285 A.2d at 312 ("With respect to decisions of the United States Court of Appeals rendered prior to February 1, 1971, we recognize that they, like the decisions of this court, constitute the case law of the District of Columbia.").

[6]  At various points the Trustees of St. Paul Methodist Episcopal Church rented its building out to "Young Peoples Synagogue, Inc.," to "Christ Temple Church," and "to the First Church of the Nazarene." *Trustees of St. Paul*, 212 F.2d at 247. Aside from the transactional lessor-lessee relationship, there was no apparent affiliation between the Trustees of St. Paul and any of those organizations.

The court emphasized that the use of the word "its" preceding "congregation" in the statute's text indicated some requisite affiliation between the congregation and the "religious organization which owns the building" and held accordingly that "concurrence of ownership and use is essential to the exemption of a church building." *Id.* at 249 n.6. In reaching that conclusion, the court reasoned that the antecedent of the word "its" is "the religious organization which owns the building." *Id.* Sawhney Trust counters that the statutory text never refers to a "religious organization which owns the building," so it is untenable to treat that phrase as the antecedent of the word "its." The better reading, in Sawhney Trust's view, is that the antecedent of the word "its" is "a church building," a phrase occurring earlier in the same sentence, so that "its congregation" refers to whatever congregation uses the church building for public religious worship. It may well be that Sawhney Trust advances the better interpretation of § 47-1002(13). But this is not a matter of first impression, and the interpretation Sawhney Trust advances is foreclosed by *Trustees of St. Paul*.

The holding of *Trustees of St. Paul* was also reaffirmed, later in the same year, by this court's predecessor in *Bethel Pentecostal*, 106 A.2d at 145. In that case, a religious corporation requested tax exemption for a newly acquired church property that was undergoing renovations. *Id.* at 144. Although congregants

visited the church occasionally and would pray or "sing a song or two" before helping with the renovation work, the congregation held its regular services at another location. *Id.* The court found the property ineligible for exemption because "[t]o hold that property which is being prepared for use as a church is the same as property which is being used as a church would be a distortion of the plain language of the statute." *Id.* The court further held, as most relevant here, that because the property was pending sale during the contested time period—so that it was still owned by the seller, an Episcopal church, but was being used by the buyer, Bethel Pentecostal—the property did not satisfy the concurrent ownership and use test, which is "essential to the exemption of a church building." *Id.* at 145 (quoting *Trustees of St. Paul*, 212 F.2d at 249 n.6).

The holdings of both *Trustees of St. Paul* and *Bethel Pentecostal* are unambiguous and provide that "concurrence of ownership and use is essential to the exemption of a church building." *Trustees of St. Paul*, 212 F.2d at 249 n.6; *Bethel Pentecostal*, 106 A.2d at 145. We thus agree with the trial court that Sawhney Trust was required to plead concurrence of ownership and use in order to claim exemption under § 47-1002(13). We likewise agree with the government that the arguments advanced by Sawhney Trust for the alteration or wholesale

elimination of this statutorily derived standard would be better addressed to the District of Columbia Council or to the en banc court.

**B.**

Having found that concurrence of ownership and use is required under § 47-1002(13), we now address whether Sawhney Trust's petition set forth a facially plausible claim that it concurrently owns and uses the Gurdwara. We believe it did.

Sawhney Trust's ownership of the Gurdwara was plainly alleged in its petition. What is in dispute is whether Sawhney Trust *uses* the Gurdwara. In its petition, Sawhney Trust stated that it "operates Sikh Gurdwara (Sikh Temple), as its auxiliary for conducting many religious activities" and that the Gurdwara is dedicated to "meeting the religious, social, cultural, educational and spiritual needs of the Sikh Community in the District."

The trial court found these allegations insufficient as a matter of law to establish Sawhney Trust's use of the Gurdwara for two related reasons. First, it concluded that the property was "not entitled to an exemption under D.C. Code § 47-1002(13) because Sawhney Trust, the Property's owner, is a legal entity

separate and apart from the Sikh community that uses the Property." Second, as to Sawhney Trust's representation that it operates the Gurdwara as "its auxiliary," the court was "not persuaded by Sawhney Trust's attempt to classify the Sikh Temple as an auxiliary of Sawhney Trust." An auxiliary relationship was inapposite, in the trial court's view, because while this court's precedents recognize that buildings owned by one charitable organization and operated by an auxiliary charitable organization may be entitled to a tax exemption under § 47-1002(8) (providing a tax exemption for buildings "belonging to and operated by" charitable organizations), the same is not true of church buildings. *Compare Catholic Home for Aged Ladies v. District of Columbia*, 161 F.2d 901, 902 (D.C. Cir. 1947) (holding a non-profit "old ladies' home" owned by one charitable organization and operated by its auxiliary was entitled to an exemption under § 47-1002(8)'s predecessor statute), *with Trustees of St. Paul*, 212 F.2d at 249 n.6 (holding *Catholic Home*'s analysis of the charitable building exemption inapplicable to the church building exemption now codified at § 47-1002(13)). Neither is a valid reason to deny the exemption as a matter of law.

### 1. There Is No Legal Identity Requirement for a § 47-1002(13) Exemption

The trial court found Sawhney Trust was not entitled to exemption because it "is a legal entity separate and apart from the Sikh community that uses the

property." This reasoning echoed the government's view, espoused before the trial court, that a church owner cannot claim the § 47-1002(13) tax exemption if it "is a separate entity from the congregation which uses" the church. Sawhney Trust concedes that the Sikh community uses the Gurdwara but argues that unlike the transactional relationships between the entirely separate church owners and congregations in *Trustees of Saint Paul* and *Bethel Pentecostal*, it is itself an integral part of the Sikh community. Sawhney Trust submits that "there is no meaningful separation between the Trust and the community that attends services at the Gurdwara," and that "individual trustees of the Trust are themselves members of the Gurdwara's congregation and, alongside other members of the congregation, make up the leadership at the Gurdwara."[7]

We agree that those facts, if established, would demonstrate that Sawhney Trust uses the Gurdwara for public religious worship so that it would be entitled to a tax exemption under § 47-1002(13). Neither *Trustees of St. Paul* nor *Bethel*

---

[7] We acknowledge that Sawhney Trust's petition was not a model of clarity and that it has had to flesh out this point in the appellate briefing, as quoted above. But the petition does allege that Sawhney Trust "operates Sikh Gurdwara," that the Gurdwara is "owned and used by a single congregation," and that it is not "owned by one organization and used by another group or congregation." We view the language in the appellate briefing as mere elaboration on the petition's representations, which themselves were sufficient to survive a motion to dismiss.

*Pentecostal* suggest that there must be a precise legal identity shared by the church owner and congregants in order to qualify for this property tax exemption. *Trustees of St. Paul* concerned one religious organization leasing its church to several different and unaffiliated organizations. 212 F.2d at 247. *Bethel Pentecostal*, likewise, addressed the situation where one religious organization allowed another unaffiliated organization to use its church property during the pendency of a sale between the two. 106 A.2d at 144. In each of those decisions, the court dealt with buildings, the ownership and use of which was divided between wholly unaffiliated religious organizations engaged only in arms-length transactional relationships. Here, unlike in *Trustees of St. Paul* or *Bethel Pentecostal*, there is only one organization—Sawhney Trust—and no indication that some separate organization owns or uses the Gurdwara. To the contrary, Sawhney Trust has alleged that it alone operates the Gurdwara. *Trustees of St. Paul* and *Bethel Pentecostal* do not stand for the proposition that *the congregation* must itself own the church building in question. The cases require instead that the congregation not be wholly distinct from the entity that does.

Nor do we think it makes any sense to require that a church's owner and its congregation be the same legal entity in order to qualify for this tax exemption, a condition that does not appear in the relevant statutory language or in the case law.

For starters, it is not clear what such a requirement would even mean. The word "congregation" is not defined in the statute, but in this context is generally understood to mean "an assembly of persons" who meet, often "habitually," for "worship" and "for religious instruction." *See, e.g.*, Webster's Third New International Dictionary 478 (2002). It is not typically defined by its legal form, nor indeed by any legal formality.

Perhaps the trial court was endorsing OTR's view that the exemption is inapplicable "because the [Gurdwara] is owned by [Sawhney] Trust, rather than the congregation that worships there," and because Sawhney Trust "appears to be governed by a board of trustees who are not appointed or controlled by the congregation using the property." It is unclear how many churches would run afoul of that test—requiring that the congregants themselves have ultimate control over the church building's ownership—and when pressed on this point at oral argument the government offered little defense of it.[8] *See Roberts-Douglas v.*

---

[8] For instance, when asked if a church building owned by one of the church's bishops would qualify for tax exemption, government counsel offered a "probably," provided the bishop was "participating in the church." *See, e.g.*, *Roberts-Douglas*, 624 A.2d at 411 (Wagner, J., concurring) (describing church as being "owned and controlled by Bishop Meares and his family"). That is tough to square with OTR's position, and the one the government took before the trial court, that the congregation itself must exercise control over the ownership of the church. Likewise, when asked whether a church placing legal title to a place of worship in

*(continued…)*

*Meares*, 624 A.2d 405, 410–11 (D.C. 1992) (describing the "Evangel Temple" in the District of Columbia as "governed by a Presbytery composed of ministers" that "holds title to all church property"); *see generally* Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 327–30 (2016) (explaining that religious associations governed by congregations represent only one end of a wide spectrum of religious polity and that "many religious associations are neither 'congregational' nor 'hierarchical,'" but "fall somewhere between the two, or change over time," with this being "particularly true of non-Christian religious organizations, which often do not share the Christian notions of 'assembly' and 'membership'").

There are strong reasons for us to tread lightly in this area rather than extending a preferred tax-exempt status only to religious organizations that subject themselves to one particular form of internal governance. *See* U.S. Const. amend. I; *Holy Virgin Prot. Cathedral of the Russian Orthodox Church Outside Russ. v.*

---

*(...continued)*
a trust controlled by the church would qualify for exemption, the government responded that "might get us closer," but quickly reversed its position, saying "if the trust is not a church, then no," it would not qualify. *But see, e.g.*, *Mount Jezreel Christians Without a Home v. Board of Trustees of Mount Jezreel Baptist Church*, 582 A.2d 237, 239 (D.C. 1990) (describing "title to the church property" as "vested in the trustees or directors," with the property itself "held in trust 'for the uses and purposes named and no other'").

*Chertoff*, 499 F.3d 658, 662 (7th Cir. 2007) ("Courts normally do not interfere in the internal affairs of religious institutions.") (citing *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 721 (1976)). Where neither the statutory text nor our precedents even hint at such a restrictive reading of § 47-1002(13), we reject it.

### 2. *The Alleged Auxiliary Relationship Between Sawhney Trust and the Gurdwara May Satisfy the Requirements of § 47-1002(13)*

The trial court and the government both discount Sawhney Trust's allegation that it operates the Gurdwara "as its auxiliary." To varying degrees they treat that allegation as, at best, inapposite and, at worst, a concession that Sawhney Trust does not itself use or operate the Gurdwara. It is neither. It is a plain allegation that Sawhney Trust operates the Gurdwara.

Sawhney Trust's use of the word "auxiliary" appears to have been a misguided attempt to bring itself under the auspices of *Catholic Home*, which disavows the concurrence of ownership and use requirement for charitable buildings now codified under § 47-1002(8). 161 F.2d at 902 (construing D.C. Code § 47-801a(h) (1940 Ed. & 1946 Supp.)). As explained above, *Catholic Home* provides that a building owned by one charitable organization and used by

another satisfies the requirements of § 47-1002(8), governing "[b]uildings belonging to and operated by [charitable] institutions." D.C. Code § 47-1002(8); 161 F.2d at 902. That position was rejected as inapplicable to church buildings under the exemption now codified at § 47-1002(13) by *Trustees of St. Paul*. 212 F.2d at 249 n.6. But Sawhney Trust's legal misstep does not detract from its critical factual allegation that it alone operates the Gurdwara.

While Sawhney Trust's reliance on *Catholic Home* is indeed misplaced to the extent it argues that concurrent ownership and use is not required under § 47-1002(13)—in direct contravention of the holding in *Trustees of St. Paul*—it does not follow that Sawhney Trust's description of the Gurdwara as its auxiliary defeats or is irrelevant to its claim. Although we reaffirm here that concurrence of ownership and use is required under § 47-1002(13), that legal conclusion does little to resolve the question presented by the factual allegations in this case: Whether a church building owned by a single organization and operated in an auxiliary nature by that same organization can satisfy concurrent ownership and use. In resolving this question, we find the court's analysis of auxiliary organizations in *Catholic Home* instructive.

Catholic Home for Aged Ladies, a nonprofit charitable corporation, provided rent-free housing to elderly women without means to support themselves. *Catholic Home*, 161 F.2d at 901. Recognizing that there was additional need for low-rent housing among elderly women of limited means, Catholic Home for Aged Ladies purchased an additional residential property and incorporated an auxiliary nonprofit corporation called Saint Margaret Mary House to operate the home. *Id.* Catholic Home for Aged Ladies applied for real property tax exemption on this newly acquired residential property and was denied on the basis that there was no concurrence of ownership and use. *Id.* The United States Court of Appeals for the District of Columbia Circuit reversed on the grounds that concurrence of ownership and use was not required under § 47-1002(8)'s predecessor statute. *Id.* at 902.

In addition to this central statutory holding, the court also considered the auxiliary structure of the organizations under the framework of concurrent ownership and use and ultimately rejected the notion that the property at issue was, in fact, separately owned and operated. Although the property was owned by Catholic Home for Aged Ladies and operated by its "auxiliary charity" Saint Margaret Mary House, the court designated this distinction a mere technicality, saying, "if we look through the shadow to the substance we find that both charities

are, except in name, one and the same, though separately organized to accomplish each [charity's] specific purpose." *Id.* Whether Sawhney Trust concurrently owns and operates the Gurdwara is ultimately a factual question that will turn on whether it participates in the religious activities of the Gurdwara or instead deals with it only through arms-length transactions,[9] as in *Trustees of St. Paul* and *Bethel Pentecostal*. At this stage, Sawhney Trust's allegations that it owns and operates the Gurdwara as its auxiliary, providing religious services to meet the needs of the local Sikh community, is enough to state a plausible claim that it meets the requirements of this test.

To the extent the trial court found the auxiliary nature of the Gurdwara's operation insufficient because it indicates that Sawhney Trust is engaged in additional activities that are not explicitly or traditionally religious, we do not believe that this defeats its claim either. In its denial letter, OTR stressed that Sawhney Trust's "purposes and activities consist of providing tuition assistance to needy students and providing financial support to the All India Pingalwara Society or other charities in India," benefiting individuals who are not members of the

---

[9] What we mean by "religious activities"—an admittedly opaque term—is that Sawhney Trust must be engaged in the religious elements of the Gurdwara, as opposed to merely providing facilities management, financial support, or the like, as was the case in *Trustees of St. Paul* and *Bethel Pentecostal*.

congregation. Sawhney Trust does not dispute that it originally incorporated to engage in charitable work, that it continues to engage in charitable work outside the scope of the Gurdwara's operation, or that much of this work benefits residents of India. Sawhney Trust submits on appeal that its petition "used the term 'auxiliary' to describe the Gurdwara's relationship to the Trust, indicating that owning and operating the Gurdwara is an integrated function of the Trust alongside the Trust's other tax-exempt charitable activities." This is an inference that can readily be drawn from the facts alleged and it is not one that defeats a claim for tax exemption under § 47-1002(13). Sawhney Trust's characterization of the Gurdwara's operation as auxiliary to its other charitable work does not make Sawhney Trust's claim for exemption implausible. Just as two separately incorporated organizations may satisfy concurrence of ownership and use where they are "except in name, one and the same," *Catholic Home*, 161 F.2d at 902, there is no reason why a single organization engaged in charitable work extending beyond its operation of a church could not.

Indeed, we find no basis in either the text of the statute or this court's precedents to support the proposition that an otherwise tax-exempt church property must lose its exemption if the organization owning it engages in outside charitable work. Although the property itself must be used "primarily and regularly . . . for

public religious worship," there is no like limitation on the primary activities of the entity that owns the property. D.C. Code § 47-1002(13). Imposing such a requirement would not only significantly narrow the existing exemption, without a basis in text or precedent for doing so, but would also run counter to the charitable practices—and in many cases, teachings—of diverse religious traditions. We decline to adopt such an interpretation.

## C.

The government makes two additional arguments in support of affirmance that were not addressed by the Superior Court. First, it argues that Sawhney Trust's petition did not allege concurrent ownership and use because it conceded that the property actually remains under the operation of its prior owner, the Sikh Cultural Society. Second, the government argues that Sawhney Trust is ineligible for exemption under § 47-1002(13) because it is a charitable organization rather than a "religious organization." Neither argument is persuasive.

### 1. The Pleadings Do Not Establish that the Sikh Cultural Society Operates the Gurdwara.

The government argues on appeal that Sawhney Trust does not, in fact, operate the Gurdwara. It points to Sawhney Trust's statement in its petition that

"[t]he Property since its purchase is dedicated not only to the identical purpose of Sikh Society, but has added several religious activities." That is an implicit concession, the argument goes, that "a distinct corporate entity, the Sikh Cultural Society used the property for religious activities before it sold the property and continues with the same religious activities at the Temple after the sale."

That is a quantum logical leap, and not one we can draw from the pleadings. To say that the Gurdwara remains dedicated to the identical purpose that the Sikh Cultural Society used the Gurdwara for—serving the Sikh community—does not express, imply, suggest, or even hint that the Sikh Cultural Society rather than Sawhney Trust continues to operate the property. In fact, Sawhney Trust alleged just the opposite, that it itself operates the Gurdwara. If the government believes otherwise, for whatever reason, it can attempt to develop a record to that effect on remand. But at this stage of the proceedings, Sawhney Trust is entitled to the benefit of all inferences and there is no reason to draw this tenuous inference advocated by the government.

*2. Section 47-1002(13) Contains No "Religious Organization" Requirement Beyond that the Same Organization Own and Use the Church*

In addition to its other claims, the District of Columbia argues that Sawhney Trust does not qualify for exemption under § 47-1002(13) because it is not a

"religious organization," as that phrase appears in *Trustees of St. Paul*, 212 F.2d at 249 n.6, though it is not in the text of § 47-1002(13). It bases this conclusion on OTR's statement that Sawhney Trust characterized itself in its application for exemption as a "charitable, non-profit organization." Sawhney Trust states on appeal that it considers itself a religious, charitable, and educational organization and asserts that the organization itself is a tax-exempt nonprofit corporation.

Our precedents instruct "that the terms 'religion' and 'religious'" are to be construed, for purposes of the tax exemption under § 47-1002(13), in accordance with their "ordinary usage," which defies classification of religions via "rigid concepts." *Washington Ethical Soc'y v. District of Columbia*, 249 F.2d 127, 129 (D.C. Cir. 1957). We thus need not determine "broadly whether [Sawhney Trust] is in an ecclesiastical sense a religious society or church" to answer the narrow question of whether its property qualifies for exemption under § 47-1002(13). *Id.* While *Trustees of St. Paul* states that the tax exemption under § 47-1002(13) inheres to the benefit of the "religious organization which owns the building," 212 F.2d at 249 n.6, it does not presume to adopt an interpretation of what qualifies as a

religious organization, beyond that it be an organization that owns and operates the church in question.[10]

Exemption of church buildings under § 47-1002(13) exists in the context of like exemptions for "art galleries, libraries, public charities, hospitals, schools and colleges." *Washington Ethical Soc'y*, 249 F.2d at 129; D.C. Code § 47-1002. The critical inquiry under the statutory framework is the use of the property, not the structure of the organization that owns it. That is a marked contrast from the separate real property tax exemption provided in § 47-1002(14), which is limited to buildings used for religious activities so long as they also "belong[] to religious corporations and societies." Under that exemption, unlike § 47-1002(13), there is at least a plausible textual argument that the owner of the building must, in some more limited sense, be a religious organization. But no similarly restrictive language appears in § 47-1002(13). Where an organization owns and operates a

---

[10] There was no occasion to consider this issue in *Trustees of St. Paul* where there was no dispute that the church owner was a religious organization; the dispute, instead, centered on whether one religious organization leasing its church out to an entirely separate and unaffiliated religious organization in an arms-length transaction could benefit from the tax exemption under § 47-1002(13). 212 F.2d at 246–47. We do not disturb *Trustees of St. Paul*'s holding, which did nothing more than answer that narrow question in the negative.

church by participating in its religious elements, see *supra* note 9, it is a religious organization in the relevant sense that term was used in *Trustees of St. Paul*.

Sawhney Trust has alleged enough to establish a plausible claim that the Gurdwara is "primarily and regularly used by its congregation for public religious worship."  D.C. Code § 47-1002(13).  Where this standard is met, a claim for exemption will not be defeated because the organization itself could be characterized as doing more to serve another cause in the public interest on a not-for-profit basis.

## IV.

We reverse the trial court's order dismissing Sawhney Trust's petition and remand for further proceedings.  Sawhney Trust filed a petition in the Superior Court alleging that it owns and operates the Gurdwara, which provides religious services to meet the cultural and spiritual needs of the Sikh community in the District.  If Sawhney Trust can establish those facts as true, it is entitled to an exemption from real property taxes for the Gurdwara under § 47-1002(13).

*So ordered.*